IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZTS INVEST, A.S.,                    )
                                     )
            Plaintiff,               )
                                     )
     vs.                             )   Civil Action No. 01-1359
                                     )
TIPPINS FIELD SERVICES, INC.         )
and TIPPINS, INCORPORATED,           )
                                     )
            Defendants.              )

OPINION

In this diversity action, plaintiff, ZTS Invest, A.S. ("ZTS"), seeks damages from defendant Tippins Field Services, Inc. ("TFS") for breach of contract (Count I), unjust enrichment (Count II) and account stated (Count III), as well as damages from defendant Tippins, Incorporated ("Tippins, Inc.") for breach of contract (Count IV).  ZTS's claims arise out of a project for the construction of a steel rolling mill in Ostrava, Czech Republic.

On May 27, 2004, United States Magistrate Judge Ila Jeanne Sensenich issued a Report and Recommendation in connection with a motion for summary judgment that had been filed by ZTS under Fed.R.Civ.P 56,[1] recommending that ZTS's motion be granted with respect to Counts I and III and denied with respect to Counts II and IV.  Specifically, Magistrate Judge Sensenich concluded that TFS is liable to ZTS in the principal amount of

---

1. The case was referred to Magistrate Judge Sensenich for pretrial purposes.

$193,039.31 with respect to Counts I and III; that ZTS is not entitled to judgment in its favor as a matter of law with respect to Count II because a claim for unjust enrichment cannot be maintained where the relationship of the parties is governed by a contract; and that issues of fact preclude the entry of judgment in ZTS's favor as a matter of law on Count IV in which ZTS seeks damages from Tippins, Inc. for breach of contract.  By order dated June 18, 2004, the Court adopted Magistrate Judge Sensenich's Report and Recommendation as the opinion of the Court.

        Following the disposition of ZTS's motion for summary judgment, the only remaining liability issue is whether Tippins, Inc. also is liable for the monies owed to ZTS by TFS based on an agreement executed on August 13, 1999.  After a non-jury trial, the Court makes the following Findings of Fact and Conclusions of Law, and, for the reasons stated therein, judgment will be entered in favor of Tippins, Inc. and against ZTS.

<u>Findings of Fact</u>

        1.  Tippins, Inc. designs and manufactures equipment for steel rolling mills.  Tippins, Inc. employs approximately 200 to 250 persons.  TFS installs the steel rolling mills designed by Tippins, Inc. and provides site services for the customers of Tippins, Inc.  TFS employees approximately 80 to 90 persons most of whom are engineers.  TFS is a wholly owned subsidiary of

2

Tippins, Inc.[2]  The headquarters of both Tippins, Inc. and TFS

are located at 435 Butler Street, Pittsburgh, Pennsylvania,[3] and

they share the same officers.  (ZTS Exhs. 12 and 13).  However,

during the relevant time period, TFS held its own Board meetings,

filed its own tax returns, kept its own general ledger, had its

own employees, maintained its own payroll and bank accounts,

entered into contracts and purchase orders apart from Tippins,

Inc. and operated by using its own funds which were generated

from project work.  Because TFS is a small entity, Tippins, Inc.

performs administrative services for TFS for a fee pursuant to

annual contracts.[4]  In this litigation, Tippins, Inc. and TFS are

represented by the same counsel.

     2.  In 1998, Nova Hut A.S., a steel maker, hired ICF

Kaiser Netherlands B.V. ("ICF Kaiser") to serve as general

_____

2. In their answer to ZTS's complaint, TFS and Tippins, Inc.
denied ZTS's allegation that TFS is a wholly owned subsidiary of
Tippins, Inc.  (Complaint, ¶¶ 3-4, Answer ¶¶ 3-4).  However,
defendants failed to respond to ZTS's subsequent requests for
admissions, which included a request to admit that TFS is a
wholly owned subsidiary of Tippins, Inc.  (ZTS Exh. 11).  Thus,
under Fed.R.Civ.P. 36, the requests for admissions are deemed
admitted.  (*See* Doc. No. 34 - Magistrate Judge's Report &
Recommendation, p. 2, n.2).

3. Although the headquarters of both Tippins, Inc. and TFS are
located at the same address, only TFS maintains offices at
project sites.

4. Tippins, Inc. was originally founded in 1928 and traded in
equipment for the mining industry.  In 1945, Tippins, Inc.
shifted its focus to the steel industry.  TFS was created in 1987
to perform field services for Tippins, Inc.

contractor for the construction of a steel rolling mill in the
Czech Republic ("the Nova Hut project").   Thereafter, ICF Kaiser
entered into a subcontract with Tippins, Inc. for the design of
the steel rolling mill and a subcontract with TFS for the
installation of the steel rolling mill (including the procurement
of items in the Czech Republic that were necessary for the
installation).[5]   In turn, both Tippins, Inc. and TFS entered into
several hundred subcontracts for the Nova Hut project.   In
addition, TFS established an office in Ostrauba, Czech Republic
for the Nova Hut project.

        3.   ZTS is in the business of manufacturing and selling
industrial and hydraulic equipment, including steel finishing
equipment.   Pursuant to TFS Purchase Order Nos. 21900-240025
(dated March 13, 1998) and 21900-240065 (dated August 25, 1998),
ZTS manufactured and supplied certain industrial equipment to TFS
for the Nova Hut project.[6]   (ZTS Exhs. 2 and 3).   Because the
industrial equipment that TFS purchased from ZTS had to meet the

---

5. The amount of ICF Kaiser's subcontracts with Tippins, Inc. and
TFS were approximately $50 million and $20 million, respectively.

6. Although the purchase orders indicate that they are the
purchase orders of **"TIPPINS Field Service,"** the Terms and
Conditions set forth on the reverse side indicate, *inter alia*,
that the purchase orders constitute offers by Tippins, Inc. to
buy the goods and/or materials specified on the face of the
purchase orders.   However, both purchase orders issued to ZTS by
TFS state that the Terms and Conditions set forth on the reverse
side of the purchase orders are subservient to the Standard
General Conditions applicable to the Nova Hut project.   (ZTS Exh.
2, pp. 3-4, Exh. 3, p. 2).

specifications of Tippins, Inc.'s design of the steel rolling
mill for the Nova Hut project, the Request for Quotation and
Purchase Orders issued to ZTS by TFS referred ZTS to Tippins,
Inc. regarding certain matters, such as the entity to whom
commercial and technical questions were to be addressed, the
entity whose approval was needed to deviate from the design
drawings, and the entity to whom all reports and certification
documents were to be sent upon completion of the equipment to be
supplied.  (ZTS Exhs. 1, 2 and 3).

    4.  ZTS fully complied with its obligations under the
two purchase orders issued by TFS, and, between April, 1999 and
August, 1999, TFS paid a total of $523,431.05 to ZTS, resulting
in a balance due of $281,074.95.

    5.  The Nova Hut project was plagued with problems,
including ICF Kaiser's financial difficulties and lack of
expertise in installing steel rolling mills which required TFS to
exceed the scope of its subcontract with ICF Kaiser.  In the
summer of 1999, ICF Kaiser went bankrupt and stopped paying its
subcontractors, including Tippins, Inc. and TFS.  The cessation
of payments from ICF Kaiser adversely affected the ability of
Tippins, Inc. and TFS to pay their respective subcontractors.[7]

---

7. At this stage of the Nova Hut project, approximately 200
subcontractors (100 subcontractors of Tippins, Inc. and 100
subcontractors of TFS) were adversely affected by ICF Kaiser's
cessation of payments to Tippins, Inc. and TFS, placing a huge
                                                (continued...)

6.   Michael Smarto, Tippins, Inc.'s Executive Vice President and Chief Financial Officer, assigned Robert Simmers, Tippins, Inc.'s Purchasing Manager, the responsibility of dealing with the subcontractors of Tippins, Inc. and TFS who were no longer being paid due to ICF Kaiser's cessation of payments to Tippins, Inc. and TFS.[8]  With respect to the money owed to ZTS under its subcontract with TFS, Mr. Simmers initially dealt with two of ZTS's principals, Lubomir Holecek and Jan Simko.[9]  The negotiations between Mr. Simmers and Messrs. Holecek and Simko resulted in execution of the following agreement captioned Irrevocable Payment Commitment (the "IPC") on August 13, 1999:

### IRREVOCABLE PAYMENT COMMITMENT

> FOR VALUE RECEIVED, Tippins Field Services, a Pennsylvania corporation ("Tippins"), hereby acknowledges that it owes ZTS Invest ("Subcontractor"), excluding any applicable Value Added Tax, the sum of $281,074.95 (the "Total Payment Amount") representing

---

(...continued)

administrative burden on Tippins, Inc. because, in addition to dealing with the problems arising out of its inability to pay its subcontractors, Tippins, Inc. was contractually obligated to deal with the problems arising out of TFS's inability to pay its subcontractors.

8. As noted previously, Tippins, Inc. provided administrative services to TFS for a fee pursuant to annual contracts.  It was pursuant to this arrangement that Mr. Smarto and Mr. Simmers were handling the problems which arose from TFS's inability to pay its subcontractors on the Nova Hut project due to the cessation of payments from ICF Kaiser.

9. Because neither Mr. Holecek nor Mr. Simko spoke English, a translator was required for Mr. Simmers to converse with these gentlemen.

outstanding amounts due for work (including retention) performed by Subcontractor for Tippins in connection with the Nova Hut Flat Roll Mini Mill (the "Project") under purchase order numbers 21900-240025 and 21900-240065. **Of this amount, $78,035.63 (the "Irrevocable Payment Amount") is to be paid to Subcontractor via this Irrevocable Payment Commitment. The balance owed to Subcontractor is to be paid directly by Tippins per an agreed upon schedule.** In order to provide security for any amount due to Tippins on Final Acceptance of the Project (as defined in the ICF Kaiser/Tippins Subcontract), Nova Hut a.s. and ICF Kaiser Netherlands B.V. ("ICF Kaiser") have established an escrow account (the "Escrow Account") at Ceskoslovenska Obehodni Banka ("CSOB") in Ostrava, Czech Republic. The Irrevocable Payment Amount due from Tippins to Subcontractor will be paid by Tippins concurrently with the release to Tippins of amounts due to Tippins from the Escrow Account, always provided that at the time of release there are sufficient funds in the Escrow Account which are contractually due to Tippins under the terms of the ICF Kaiser/Tippins Subcontract.   (Emphasis added).

In order to insure that the Subcontractor will be paid, Tippins hereby IRREVOCABLY ASSIGNS to Subcontractor the right to receive the Irrevocable Payment Amount from the Escrow Account and hereby agrees to request ICF Kaiser not to pay any amounts to Tippins from the Escrow Account unless concurrently with or prior to such payment the Irrevocable Payment Amount is paid to Subcontractor and by its signature hereto ICF Kaiser hereby agrees to acknowledge and consent to this assignment on these terms.  This assignment shall not transfer any of Tippins payment or other obligations owing to Subcontractor and shall not otherwise relieve Tippins of its Total Payment Amount obligation and other liability to Subcontractor.

All payments to Subcontractor shall be paid by wire transfer to the following account: Devin banks, a.s., Bratislava, Account No. 158000-1130609011/4800.

Tippins agrees that the instructions contained in this Irrevocable Payment Commitment are irrevocable by Tippins and that Subcontractor may rely on them and may present this Irrevocable Payment Commitment to ICF Kaiser at its Ostrava Town Office as irrefutable evidence of Tippins' obligations and of Subcontractor's

> right to payment from the Escrow Account subject to the
> terms hereof.
>
> This agreement will not prejudice the rights and
> obligations of the parties under purchase order No.
> 21900-240025 and 21900-240065.
>
> Witness the due execution hereof, intending to be
> legally bound hereby, this 31st day of August, 1999.

(ZTS Exh. 4).

Although the IPC indicates that it was signed by Mr. Simmers in

his capacity as Tippins, Inc.'s Director of Purchasing, this

indication is a mistake. In fact, at the time he signed the

August 13, 1999 IPC with ZTS, Mr. Simmers was acting on behalf of

TFS pursuant to authority that had been granted to him by Mr.

Smarto who, in addition to being the Executive Vice President and

Chief Financial Officer of Tippins, Inc., was the Treasurer of

TFS.[10]  No retention funds were ever released from the escrow

account referred to in the IPC. As a result, ZTS has never been

paid the $78,035.63 that is the subject of the August 13, 1999

IPC.

7. As contemplated by the IPC, on January 17, 2000,

TFS and ZTS entered into an agreement regarding a payment

---

10. The drafting of the IPC was a joint effort of ICF Kaiser and
Tippins, Inc.  Mr. Simmers negotiated IPCs with 20 to 25 of TFS's
subcontractors and 10 to 15 of Tippins, Inc.'s subcontractors.
At no time during the negotiations between Mr. Simmers and
Messrs. Holecek and Simko concerning the August 13, 1999 IPC with
ZTS did either Mr. Holecek or Mr. Simko raise the issue of
requiring a signature of a representative of Tippins, Inc. on the
IPC.

schedule for the balance of $203,039.32 owed to ZTS by TFS.[11]
Messrs. Simmers and Smarto negotiated the January 17th agreement
on TFS's behalf and a gentleman by the name of Milan Jedlicka
negotiated the agreement on ZTS's behalf.[12]   The January 17th
agreement provides in part:

AGREEMENT

> This Agreement is made as of the 17 day of January
> 2000, between Tippins Field Service, Inc. (Tippins),
> ... and ZTS Invest (ZTS) ....   ZTS is being represented
> in this matter by B.E.A. Trading Corp. and will be
> referred to hereafter in this Agreement as ZTS/B.E.A.
>
> WHEREAS, ZTS/B.E.A. provided certain mechanical
> equipment for the Nova Hut project resulting from
> Tippins purchase order numbers 21900-240025 and 21900-
> 240065, and
>
> WHEREAS, ZTS/B.E.A. has billed Tippins the final amount
> of $281,074.95 (except for the retention) and of this
> amount $78,035.63 has been pledged by Tippins to be
> paid out of the project's retention fund in accordance
> with a signed Irrevocable Payment Commitment, leaving a
> balance of $203,039.32 to be paid to ZTS/B.E.A. via
> this Agreement,
>
> Now therefore, the parties agree that Tippins will pay
> to ZTS/B.E.A. the amount of:
>
> $10,000 payable on  8 February 2000

---

11. The balance of $203,039.32 that is the subject of the January
17, 2000 agreement between TFS and ZTS is computed by subtracting
the amount that is subject to the IPC ($78,035.63) from the total
balance due to ZTS by TFS ($281,074.95) for Purchase Order Nos.
21900-240025 and 21900-240065.

12. Mr. Jedlicka was "the major player" in a small Czech trading
company known as B.E.A. Trading Corporation.  Based on his
history with ZTS, Mr. Jedlicka was asked to attempt to collect
the debt owed to ZTS by TFS and he was given a power of attorney
to act on ZTS's behalf for the purpose of doing so.

9

$40,000 payable on 29 February 2000
$10,000 payable on 24 March 2000
Balance ($140,039.32) to be paid in ten (10) equal
monthly installments starting 31 March 2000 and ending
31 December 2000.
Note: Payments are to be wire transferred to B.E.A.
Trading Corp at Republic National Bank of New York,
Account #0130027197.

\*     \*     \*

In the event that Tippins does not make the agreed upon
payments per the enclosed schedule, ZTS/B.E.A. shall
charge Tippins interest of 1.5% per month or a
corresponding daily prorate amount for any unpaid
balance.  In the event two (2) months would elapse
without a payment being made by Tippins, this Agreement
is considered null and void and ZTS/B.E.A. shall have
the right to pursue its legal remedies under the
original contract for the full amount then due and
owing plus interest and any other damages that may
pertain.

\*     \*     \*

(ZTS Exh. 5).

The January 17, 2000 agreement indicates that Mr. Simmers was

signing the agreement on TFS's behalf.[13]

8.   Pursuant to the terms of the January 17, 2000

agreement between TFS and ZTS, on February 8, 2000, TFS wired a

$10,000 payment to Account No. 130027197 at the Republic National

Bank of New York in New York, New York.  (Tippins, Inc. Exh. A).

However, TFS did not wire any further payments to ZTS pursuant to

---

13. As noted previously, in addition to being Tippins, Inc.'s
Executive Vice President and Chief Financial Officer, Mr. Smarto
held the position of Treasurer for TFS, and Mr. Smarto gave
authority to Mr. Simmers to act on behalf of TFS in connection
with the negotiations with ZTS for the balance due under TFS
Purchase Order Nos. 21900-240025 and 21900-240065.

10

the January 17th agreement, and, on March 30, 2000, Mr. Smarto
sent an "update" letter to Mr. Holecek of ZTS concerning the
status of payments from TFS.[14]  The letter, which was written on
the letterhead of Tippins, Inc., was meant to be a generic letter
applicable to the unpaid subcontractors of both Tippins, Inc. and
TFS.  Mr. Smarto concluded the letter to ZTS as follows:

\*     \*     \*

> Both Mr. Simmers and I are planning a trip to the
> Czech Republic in April and will certainly meet with
> you to discuss this issue further.
>
> Tippins has worked very hard in order to meet the
> payment plan that we have recently worked out with you.
> We are not able to make the negotiated payment at the
> time of this letter, however, we are diligently working
> on several issues that have a good chance of being
> successful in providing funds that we currently do not
> have in hand.  If Tippins is successful in completing
> one or more of these transactions, and we believe that
> we will be successful, we will very quickly make
> payment to your firm.  I am hopeful that this potential
> will be realized in the next few weeks such that
> Tippins can make a payment prior to our trip to the
> Czech Republic in April.
>
> Best Regards,
>
> TIPPINS INCORPORATED
>
> s/Michael G. Smarto
> Executive Vice President & CFO

(ZTS Exh. 6).

---

14. Similar "update" letters were sent by Mr. Smarto to the other
subcontractors of Tippins, Inc. and TFS who were not being paid
due to the cessation of payments by ICF Kaiser to Tippins, Inc.
and TFS on the Nova Hut project.

9.  On July 5, 2000, Mr. Simmers sent the following letter to Mr. Simko of ZTS:

Dear Mr. Simko:

It was good to see you in Ostrava.  You requested that Tippins do two things relative to our payment situation with ZTS:

1.  You asked Tippins (sic) contact Mr. Kolev at ICF Kaiser and request that they pay $78,035 (the Irrevocable Payment Commitment amount) directly to ZTS in July.  I contacted Mr. Kolev and made this request on ZTS's behalf.  Mr. Kolev stated that ICF Kaiser was not able financially or obligated contractually to make this payment.  In essence, ICF Kaiser will not make this payment.

2.  You requested that Tippins make a payment of $100,000 in July of the approximately $200,000 due directly from Tippins (not covered by the Irrevocable Payment Commitment).  I checked with the Tippins Financial Group upon my return to Pittsburgh and as I explained to you in Ostrava, Tippins is not able to make any payments to ZTS or any other affected vendors in July.  Until the project in China closes, Tippins will not be able to make any vendor payments.

I know that this is not the news you were hoping for, but as I stated during our meeting, I was not optimistic about Tippins (sic) ability to meet your request.  Good progress is being made on the China project and it is Tippins (sic) intention to start to meet its obligation to ZTS and others via funds generated from this project.

Should you have any questions or comments, please do not hesitate to contact the undersigned.

                    Best regards,
                    TIPPINS INCORPORATED

                    s/Robert C. Simmers
                    Project Manager

(ZTS Exh. 7).

12

10. Despite Mr. Simmers' optimism concerning the generation of funds from a project in China to pay ZTS for the equipment provided by ZTS to TFS for the Nova Hut project, no additional payments have been made to ZTS under the January 17, 2000 agreement between TFS and ZTS. Thus, the principal balance that remains owing to ZTS by TFS under the January 17, 2000 agreement is $193,039.32.[15]

Conclusions of Law

11. This court has jurisdiction over the parties herein and has subject matter jurisdiction pursuant to 28 U.S.C. § 1332.

12. ZTS asserts that Tippins, Inc. is liable for the entire balance due and owing under TFS Purchase Order Nos. 21900-240025 and 21900-240065 based on the IPC which was executed on August 13, 1999. After consideration, the Court finds this argument meritless.

13. The IPC clearly states that it is TFS which acknowledges that it owes ZTS the sum of $281,074.95 under the

---

15. In a January 16, 2001 letter to John Thomas, the owner of Tippins, Inc., Mr. Holecek set forth the total amount due and owing to ZTS as follows:

| | |
|---|---|
| - non-paid commercial invoices for goods supplied | US$ 193,039.32 |
| - retention | US$  78,035.63 |
| - interest on outstanding commercial invoices | US$  30,497.45 |
| In total | US$ 301,572.40 |

(ZTS Exh. 8).

13

purchase orders issued to ZTS by TFS.  Nowhere in the IPC does it state that Tippins, Inc. agrees to assume joint responsibility with TFS for the outstanding amount owed to ZTS.  The only basis for holding Tippins, Inc. jointly responsible for the portion of the debt to ZTS covered by the IPC is the fact that Mr. Simmers indicated that he was signing the IPC as the Director of Purchasing for Tippins, Inc.[16]  However, the uncontroverted evidence established that this indication was a mistake, and that Mr. Simmers was acting on behalf of TFS when he signed the IPC pursuant to authority granted to him by Mr. Smarto, TFS's Treasurer.

14.  Next, ZTS asserts that Tippins, Inc. is liable for the balance due and owing under the TFS purchase orders issued to ZTS under an "alter ego" theory.  After consideration, the Court concludes that ZTS has failed to meet its burden of showing that the corporate veil of TFS should be pierced to impose liability

---

16. In this connection, the Court notes that the IPC applied to only $78,035.63 of the $281,074.95 owed to ZTS under the TFS purchase orders, and that payment of the $78,035.63 was expressly conditioned upon ICF Kaiser's release of funds from the escrow account established for retention on the Nova Hut project.  Thus, contrary to ZTS's position, even if Tippins, Inc. had agreed in the IPC to assume joint responsibility with TFS to ZTS, that responsibility would be limited to $78,035.63.  The Court also notes that responsibility for payment under the IPC has never arisen because no funds have been released from the escrow account by ICF Kaiser, which is a condition precedent to payment under the terms of the IPC.

14

on Tippins, Inc. for the balance due under Purchase Order Nos.
21900-240025 and 219900-240065.

15.   In <u>Lumax Ind., Inc. v. Aultman</u>, 669 A.2d 893
(Pa.Super.1995), the plaintiff sued the defendant, as owner and
operator of a corporation that ordered and agreed to pay for
light fixtures which the plaintiff delivered to third parties,
for her alleged breach of contract in failing to pay for the
goods delivered.  The plaintiff sought judgment against the
defendant individually on the theory that the facts were such
that the corporate veil should be pierced.  The trial court
denied the defendant's demurrer and entered judgment in the
plaintiff's favor.  On appeal, the Superior Court of Pennsylvania
affirmed.  On further appeal, the Pennsylvania Supreme Court
reversed, holding that the mere fact that the owner of a
corporation was the only person involved in its operation was
not, without more, a sufficient basis for piercing the corporate
veil.  In so holding, the Pennsylvania Supreme Court stated in
relevant part:

*     *     *

> We note at the outset that there is a strong
> presumption in Pennsylvania against piercing the
> corporate veil. <u>Wedner v. Unemployment Board</u>, 449 Pa.
> 460, 464, 296 A.2d 792, 794 (1972)("[A]ny court must
> start from the general rule that the corporate entity
> should be recognized and upheld, unless specific,
> unusual circumstances call for an exception....  Care
> should be taken on all occasions to avoid making the
> entire theory of corporate entity ... useless. <u>Zubik</u>
> <u>v. Zubik</u>, 384 F.2d 267, 273 (3d Cir.1967)").  Also, the

general rule is that a corporation shall be regarded as an independent entity even if its stock is owned entirely by one person.  College Watercolor Group, Inc. v. William H. Newbauer, Inc., 468 Pa. 103, 117, 360 A.2d 200, 207 (1976).

Commonwealth Court has set out the factors to be considered in disregarding the corporate form as follows:

undercapitalization, failure to adhere to corporate formalities, substantial intermingling of corporate and personal affairs and use of the corporate form to perpetrate a fraud.  Department of Environmental Resources v. Peggs Run Coal Co., 55 Comwlth Ct. 312, 423 A.2d 765 (1980).

Kaites v. Dept. of Environmental Resources, 108 Pa.Cmwlth. 267, 273, 529 A.2d 1148, 1151 (1987).  See also Watercolor Group v. Newbauer, 468 Pa. at 117, 360 A.2d at 207 (corporate veil may be pierced whenever one in control of a corporation uses that control or corporate assets to further his personal interests).

\*     \*     \*

669 A.2d at 895.

16.  With respect to the application of the alter ego theory in a case involving a parent corporation and its subsidiary, in Nobers v. Crucible, Inc., 602 F.Supp. 703 (W.D.Pa. 1985), former steel mill supervisors and managers filed an action in a Pennsylvania state court against the steel mill's successor in interest and the successor in interest's parent corporation for breach of employment contracts, and the action was removed to federal court.  The district court held, inter alia, that the plaintiffs' allegations were insufficient to support treatment of

16

the parent and subsidiary as alter egos, stating in relevant

part:

*   *   *

> Colt could possibly incur liability on the alleged
> employment contracts if the corporate separateness was
> disregarded.  A parent company, like any stockholder,
> is not normally liable for contractual obligations of a
> subsidiary, even if that corporation is its wholly-
> owned subsidiary.  George A. Davis, Inc. v. Camp Trails
> Co., 447 F.Supp. 1304, 1307 (E.D.Pa.1978).  Such
> liability occurs only by application of the "alter ego"
> theory to pierce the corporate veil.  Publicker
> Industries, Inc. v. Roman Ceramics Corp., 603 F.2d
> 1065, 1069 (3d Cir.1979).  The veil should be pierced
> "when the court must prevent fraud, illegality, or
> injustice, or when recognition of the corporate entity
> would defeat public policy or shield someone from
> liability for a crime." Zubik v. Zubik, 384 F.2d 267,
> 272 (3d Cir.1967), cert. denied, 390 U.S. 988, 888
> S.Ct. 1183, 19 L.Ed.2d 1291 (1968).  The Court of
> Appeals has enunciated relevant factors to consider in
> applying this test:

>> [F]ailure to observe corporate formalities, non-
>> payment of dividends, the insolvency of the debtor
>> corporation at the time, siphoning of funds of the
>> corporation by the dominant shareholder,
>> nonfunctioning of other officers or directors,
>> absence of corporate records, and the fact that
>> the corporation is merely a facade for the
>> operations of the dominant stockholder or
>> stockholders.

> United States v. Pisani, 646 F.2d 83, 88 (3d Cir.1981).
> Gross undercapitalization is also a factor.  Id.  These
> requirements are "demanding" and require "specific,
> unusual circumstances." American Bell, Inc. v.
> Federation of Telephone Workers of Pennsylvania, 736
> F.2d 879, 886 (3d Cir.1984).

*   *   *

602 F.Supp. at 706-07.

17

17.  As noted by Tippins, Inc., the only evidence presented by ZTS concerning its alter ego theory of liability was elicited during ZTS's cross-examination of Messrs. Simmers and Smarto, and this testimony, which was uncontroverted, established that TFS held its own Board meetings, filed its own tax returns, kept its own general ledger, had its own employees, maintained its own payroll and bank accounts, entered into its own contracts and purchase orders, operated by using its own funds which were generated from project work and paid Tippins, Inc. for the administrative services it provided for TFS.[17]  Contrary to ZTS's assertion, the evidence does not support a finding that Tippins, Inc. exercised "pervasive control" over TFS.  Simply put, the Court concludes that the fact that the headquarters of TFS and Tippins, Inc. are located in the same building, the fact that the two companies share officers and the fact that the two companies are represented by the same legal counsel in this action, do not present "specific, unusual circumstances" which justify piercing the corporate veil of TFS to impose liability on Tippins, Inc. for the debt to ZTS.

---

17. In its Proposed Findings of Fact and Conclusions of Law, ZTS asserts that TFS was undercapitalized to support its argument that the Court should pierce the corporate veil of TFS and impose liability on Tippins, Inc. for the debt to ZTS.  However, as noted by Tippins, Inc., ZTS offered no evidence to support this assertion, other than the fact that TFS experienced difficulties in paying its numerous subcontractors on the Nova Hut project after ICF Kaiser stopped making payments to TFS.

18

18.  Finally, ZTS asserts that, although TFS originally may have been contractually obligated to pay the debt in question, Tippins, Inc., by its conduct, also assumed liability for the debt.  In support of this argument, ZTS relies on the August 13, 1999 IPC and Tippins, Inc.'s "subsequent affirmations of its responsibility as set forth in the evidence."  Again, the Court finds ZTS's argument unpersuasive.

19.  As to the IPC executed on August 13, 1999, as noted above, the IPC specifically states that it is TFS which is acknowledging the debt to ZTS under Purchase Order Nos. 21900-240025 and 21900-240065, and the evidence established that the indication that Mr. Simmers was signing the IPC in his capacity as Director of Purchasing for Tippins, Inc. was a mistake.  As to the other conduct of Tippins, Inc. by which it allegedly assumed liability for the debt of TFS to ZTS under the purchase orders, the only evidence on which ZTS could be relying to support this argument is Mr. Smarto's "update" letter to Mr. Holecek of ZTS dated March 30, 2000 and Mr. Simmers' letter to Mr. Simko of ZTS dated July 5, 2000.  Turning first to the "update" letter sent to Mr. Holecek by Mr. Smarto in March of 2000, as noted previously, although the letter was signed by Mr. Smarto in his capacity as Executive Vice President and Chief Financial Officer of Tippins, Inc., the evidence established that this letter was a generic letter which was sent to all of the unpaid subcontractors of

19

Tippins, Inc. and TFS due to the huge administrative burden placed upon both companies as a result of ICF Kaiser's cessation of payments on the Nova Hut project. Moreover, Mr. Smarto's "update" letter to Mr. Holecek specifically refers to the payment schedule that recently had been agreed upon by TFS and ZTS and nowhere in the letter does Mr. Smarto indicate that Tippins, Inc. is assuming liability for the debt of TFS to ZTS. As to Mr. Simmers' letter to Mr. Simko of ZTS in July of 2000, this letter specifically addresses (a) the $78,035 which was the subject of the IPC executed by TFS and ZTS on August 13, 1999 and (b) the remaining balance of approximately $200,000 which was the subject of the January 17, 2000 agreement between TFS and ZTS.[18]  Other than Mr. Simmers' failure to sign the letter specifically on TFS's behalf, nothing in the letter supports ZTS's argument that Tippins, Inc. assumed liability for the debt of TFS to ZTS. Under the circumstances, judgment will be entered in favor of Tippins, Inc. and against ZTS.

An order follows.

---

18. As noted in the Court's Findings of Fact, Mr. Jedlicka represented ZTS in the negotiations which resulted in the January 17, 2000 agreement between TFS and ZTS. During his deposition, Mr. Jedlicka testified that a parent corporation is liable for the debts of its subsidiary, and that, therefore, it did not matter who signed the January 17, 2000 agreement between TFS and ZTS. As noted by Tippins, Inc., this statement is not an accurate statement of the law and does not support ZTS's position that Tippins, Inc. assumed liability for the debt of TFS to ZTS.

20

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

ZTS INVEST, A.S.,                  )
                                   )
                Plaintiff,         )
                                   )
        vs.                        )   Civil Action No. 01-1359
                                   )
TIPPINS FIELD SERVICES, INC.       )
and TIPPINS, INCORPORATED,         )
                                   )
                Defendants.        )

ORDER

AND NOW, this 4ᵗʰ day of August, 2005, in accordance
with the Findings of Fact and Conclusions of Law filed this date,
it is ORDERED that judgment be, and hereby is, entered in favor
of defendant Tippins, Incorporated and against plaintiff, ZTS
Invest, A.S.

_____
William L. Standish
United States District Judge

cc:  Patrick Sorek, Esq.
     LEECH TISHMAN FUSCALDO & LAMPL
     Citizens Bank Building
     30ᵗʰ Floor
     525 William Penn Place
     Pittsburgh, PA 15219
     Email:

     Patrick K. Cavanaugh, Esq.
     DEL SOLE CAVANAUGH, LLC
     The Waterfront Building
     200 First Avenue
     Pittsburgh, PA 15222
     Email: